AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

JUN 2 0 2019

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| An Apple Cellular Phone Model iPhone 6s Plus (A1687) with IMEI number 358606072261946 | ) ) ) | 19MJ2583 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 952, 960 | Unlawful Importation of Methamphetamine |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Emilio Vazzana, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/20/19

*Judge's signature*

City and state: San Diego, CA    Hon. Bernard G. Skomal, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Emilio Vazzana, Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, having been duly sworn, state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant in furtherance of a narcotics smuggling investigation conducted by Special Agents of the Department of Homeland Security, Homeland Security Investigations, for the following property:

> One (1) Black Apple Cellphone
> Model: iPhone 6s Plus (A1687)
> Serial Number: FCDT6119HFM2
> IMEI: 358606072261946
> (the **Target Telephone**)

for evidence of violations of Title 21, United States Code, Sections 952 and 960, Importation of a Controlled Substance (the Target Offense).

2. On February 20, 2019, Customs and Border Protection Officers (CBPOs) seized the **Target Telephone** from Jorge ZAMORA-Madera, at the Otay Mesa Port of Entry in San Diego, California, in the Southern District of California. After ZAMORA applied for entry into the United States, the vehicle ZAMORA was driving was found to contain 60.36 kilograms (133.07 pounds) of methamphetamine concealed within. The **Target Telephone** is currently stored as evidence at the Homeland Security Investigations (HSI) Evidence room at 2255 Niels Bohr Court #221, San Diego, California 92154.

3. This search of the **Target Telephone** supports an investigation and prosecution of ZAMORA for the Target Offense. Based on the information below, there is probable cause to believe that a search of the **Target Telephone**, as described in Attachment A, will produce evidence of the Target Offense, as described in Attachment B.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offense. The evidence and information contained herein was developed from my review of documents and other evidence related to this case.

Because I make this affidavit for the limited purpose of obtaining a search warrant for the **Target Telephone**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time unless otherwise specified.

### EXPERIENCE AND TRAINING

5. I am a Special Agent (SA) of the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI) and an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

6. I have been employed as a Special Agent with HSI since August 2017. I am currently assigned to the HSI office in San Ysidro, California. I am a graduate of the Criminal Investigator Course and HSI Special Agent Training Program at the Federal Law Enforcement Training Center, where I have received training in narcotics and wire fraud investigations. Prior to becoming a Special Agent with HSI, I was employed as a Customs and Border Protection Officer ("CBPO") at the San Ysidro, California Port of Entry from June 2014 through August 2017. Prior to that, I was employed as a United States Border Patrol (USBP) Agent from March 2009 to June 2014, where I was assigned to the El Centro, California area of operations. I have also worked with and consulted with numerous agents and law enforcement officers who have investigated drug trafficking cases. I am aware that drug traffickers often communicate with their criminal associates using telephones and cellular telephones, including pre-paid cellular phones and radios. I am aware that drug traffickers often change their telephones or telephone numbers in order to avoid detection by law enforcement. Based on review of previously intercepted wire communication, interviews with defendants that I have arrested, and conversations with other law enforcement officers, I am aware that persons discussing criminal matters over the phone often speak in code or vaguely, and I am aware of some common codes or

2

methods of coding. This training and experience forms the basis for opinions expressed below.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on where and when to deliver the controlled substances.

8. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a. Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

3

g. The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

9. Based on my training and experience investigating narcotics offenses, I have learned that Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been used in connection with that telephone.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned that searches of cellular/mobile telephones, and SIM cards, associated with narcotics trafficking yields evidence:

a. tending to identify attempts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

4

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

e. tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On February 20, 2019, at approximately 9:45 a.m., Jorge ZAMORA-Madera (ZAMORA), a Mexican citizen, entered the United States through the Otay Mesa, Port of Entry (POE) in a 2006 blue Hyundai Tucson bearing California license plates. He was the sole occupant of the vehicle.

12. While assigned to the Anti-Terrorism Contraband Enforcement Team (ATCET) pre-primary lanes roving at the Otay Mesa POE, Customs and Border Protection Officer (CBPO) Canine Enforcement Officer (CEO) D. Howard and his K-9 "DAN" screened a blue 2006 Hyundai Tucson, bearing license plate CA/US 8AEU438. The K-9 showed interest in the driver's side door of the vehicle, therefore, CEO Howard and CBPO Mayhand began to inspect the vehicle in that area. CEO Howard and CEO Ruiz were both inspecting the vehicle when CEO Ruiz observed what appeared to be packages in the driver's door.

13. During this pre-primary inspection, CBPO Mayhand asked ZAMORA where he was going. ZAMORA stated he was going shopping in San Diego, California. CBPO Mayhand asked ZAMORA who was the owner of the vehicle and ZAMORA replied that he was the owner of the vehicle. CBPO Mayhand asked ZAMORA how long he had owned

the vehicle and ZAMORA stated he had owned it for about one month. CBPO Mayhand observed ZAMORA had what appeared to be a Resident Alien Card in his hand and CBPO Mayhand asked ZAMORA for the document. CBPO Mayhand then asked ZAMORA if he was bringing anything from Mexico, and ZAMORA replied that he was not bringing anything from Mexico. CBPO Mayhand asked ZAMORA one more time if he was bringing anything from Mexico and ZAMORA once again replied that he was not bringing anything from Mexico. At that time, CBPO Mayhand placed ZAMORA in handcuffs and escorted him to the CBP Security Office for further inspection.

14. During secondary inspection, CBPO R. Castanon was assigned to the Otay Mesa POE Vehicle Secondary (VS) lot area as a Z-Portal operator and performed an x-ray inspection on the Hyundai Tucson with plates CA/US 8AEU438. The x-ray inspection revealed anomalies within the vehicle's front fenders, doors, rear quarter panels and dashboard.

15. CBPO J. Valencia was assigned to the vehicle secondary lot at the Otay Mesa, California POE, and confirmed that there were packages concealed within the vehicle. One package containing a crystal-like substance was probed, and field-tested positive for methamphetamine. One hundred thirteen (113) packages were removed from the vehicle, with a total weight of approximately 60.36 kilograms (133.07 pounds) of methamphetamine.

16. Incident to ZAMORA's arrest, the **Target Telephone** was found on his person and seized.[1]

17. Based upon my experience and investigation in this case, I believe ZAMORA, as well as other persons as yet unknown, were involved in an on-going conspiracy to import methamphetamine or some other federally controlled substance and to distribute it within the United States. Based on my experience investigating narcotics smugglers, I also believe

---

[1] Agents downloaded the phone pursuant to their border search authority but are not relying on any information acquired during that search in connection with this search warrant application and are asking that the Court not consider that search in connection with this application.

ZAMORA used the **Target Telephone** to coordinate with co-conspirators regarding the importation and delivery of the methamphetamine, and to otherwise further this conspiracy both inside and outside the United States. I have learned that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites like Facebook, pictures and other digital information may be stored in the memory of a cellular telephone which identifies other persons involved in narcotics trafficking activities.

18.   Further, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Telephone** which may identify other persons involved in narcotics trafficking activities. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of ZAMORA and her co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, email messages, messages and posts from social networking sites like Facebook, pictures and other digital information are stored in the memory of the **Target Telephone**.

19.   Finally, I am aware that drug conspiracies require detailed and intricate planning to successfully evade detection by law enforcement. In my professional training and experience, this may require planning and coordination in the days and weeks prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their valuable cargo. Given this, I request permission to search the **Target**

**Telephone** for items listed in Attachment B beginning on November 20, 2018 up to and including February 20, 2019.

### PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

20. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices can be simple cellular telephone and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

22. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

23. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that ZAMORA used the **Target Telephone** to facilitate the offense of importation of a controlled substance. The **Target Telephone** was likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence of violations of Title 21, United States Code, Sections 952 and 960.

24. Because the **Target Telephone** was promptly seized during the investigation of ZAMORA's drug trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activity committed by ZAMORA continues to exist on the **Target Telephone.**

//
//
//
//
//
//
//
//
//
//
//
//
//

25. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, a Special Agent with Homeland Security Investigations, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Emilio Vazzana
Special Agent, HSI

Subscribed and sworn to before me this  20  day of June, 2019.

_____
HON. BERNARD G. SKOMAL
U.S. MAGISTRATE JUDGE

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

    One (1) Black Apple Cellphone
    Model: iPhone 6s Plus (A1687)
    Serial Number: FCDT6119HFM2
    IMEI: 358606072261946

The **Target Telephone** is currently stored at HSI evidence room located at 2255 Niels Bohr Court #221, San Diego, California 92154.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the device described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the device will be records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data for the period of November 20, 2018 to February 20, 2019:

   a. tending to identify attempts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, §§ 952 and 960.